FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JUN 23 2026
TAMMY H. DOWNS, CLERK
By: ______ DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**DANNY C. DAY, JR., INC.; DANNY DAY, JR., individually and d/b/a DANNY DAY, JR. FARMS; BRADLEY DAY, individually and d/b/a BRADLEY DAY FARMS; and DANNY DAY, JR. & SON PARTNERSHIP,** *individually and on behalf of all others similarly situated,*

Plaintiffs,

v.

**SUZHOU EAVISION ROBOTIC TECHNOLOGIES CO., LTD.;**
**E.A. VISION, INC.;**
**AGRI SPRAY DRONES, LLC;**
**C4 DRONE SERVICES, LLC;**
**TAYLOR MORELAND; and**
**DOE DEFENDANTS 1 through 100, inclusive,**

Defendants.

Case No. 2:26-cv-100-KGB

**COMPLAINT – CLASS ACTION**

**JURY TRIAL DEMANDED**

---

## COMPLAINT - CLASS ACTION

### I. INTRODUCTION AND SUMMARY OF THE CLAIMS

**1.** Plaintiffs Danny C. Day, Jr., Inc.; Danny Day, Jr., individually and d/b/a Danny Day, Jr. Farms; Bradley Day, individually and d/b/a Bradley Day Farms; and Danny Day, Jr. & Son Partnership (collectively, "Plaintiffs") bring this class action, individually and on behalf of all others similarly situated, against Defendants Suzhou EAVISION Robotic Technologies Co., Ltd., E.A. Vision, Inc., Agri Spray Drones, LLC, C4 Drone Services, LLC, Taylor Moreland, and Doe Defendants 1 through 100 (collectively, "Defendants") for damages and other relief arising from defective EAVision J100 agricultural spray drones (the "J100" or the "Drones") that Defendants designed, manufactured, distributed, marketed, sold, warranted, and/or serviced, and that were sold to farmers across the United States, including Plaintiffs.

This case assigned to District Judge Baker
and to Magistrate Judge Harris

**2.** Agricultural spray drones are remotely piloted or autonomous unmanned aircraft designed to apply liquid or granular crop inputs, such as pesticides, fungicides, and fertilizers, to farmland from the air. Farmers increasingly use them as an alternative to manned crop-dusting aircraft and ground equipment because they can treat fields quickly, reach areas that are otherwise difficult to spray, and reduce the need for workers and machinery to enter treated fields. A spray drone typically carries a product tank and spray nozzles that atomize the liquid (break it into a fine mist of small droplets) and relies on onboard navigation, sensing, terrain-following (automatic adjustment of the drone's altitude to follow the contour of the ground), and obstacle-avoidance systems to fly low over a field along programmed routes while dispensing its payload. Because the drone operates at low altitude near crops, structures, equipment, and people, its safe and effective use depends on reliable flight-control and obstacle-detection systems.

**3.** Timely, precise application of crop inputs is critical to protecting yields, and agricultural drones have become an important tool for achieving it: they can treat fields on short notice and in conditions, such as wet or muddy ground or tall standing crops, that make manned aircraft and ground equipment impractical. By applying inputs from the air with targeted control, these drones can also reduce operator exposure to chemicals and the labor and equipment costs of crop protection, making reliable drone performance increasingly important to commercial farming operations like Plaintiffs'.

**4.** The J100 was marketed as a state-of-the-art agricultural spray drone, "the only spray drone" with lidar (Light Detection and Ranging, a laser-based sensing technology used to detect obstacles and measure distances) whose "obstacle avoidance and terrain following outnumbers its competitors," yet the Drones repeatedly malfunctioned, crashed, failed to spray, and caught fire, and were never made to operate as represented.

**5.** These were not mere performance shortfalls. A heavy, autonomously operated agricultural drone that carries a tank of liquid chemical payload and flies low over fields but crashes and catches fire is unreasonably dangerous to the people, livestock, crops, structures, and equipment around it. That danger was realized here: the Drones crashed, one caught fire and burned, and a Drone narrowly missed Plaintiffs' employees. The J100's defects thus threatened not only the Drones themselves but the safety of persons and property around them.

**6.** The problems Plaintiffs experienced were not unique to their Drones. They are inherent in the J100 itself, the result of defects in its common design and manufacture, and afflict J100s in the hands of farmers across the country. Defendants have themselves admitted that these issues affect the whole J100.

**7.** As a direct and proximate result, Plaintiffs and the proposed Class suffered damages in an amount to be proven at trial.

**8.** Plaintiffs bring this action on behalf of themselves and a proposed nationwide class of purchasers of the J100, asserting claims for strict products liability, negligence, breach of the implied warranties of merchantability and fitness for a particular purpose, fraudulent misrepresentation and concealment, and unjust enrichment.

## II. JURISDICTION AND VENUE

**9.** This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which at least one member of the proposed Class is a citizen of a State different from at least one Defendant (minimal diversity), the proposed Class consists of 100 or more members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

**10.** In the alternative and as to Plaintiffs' individual claims, this Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. For purposes of § 1332(a), the citizenship of Defendants Agri Spray Drones, LLC and C4 Drone Services, LLC is determined by the citizenship of each of their members; on information and belief, no member of either limited liability company is a citizen of Arkansas, and Plaintiffs will confirm the citizenship of each member through jurisdictional discovery if necessary.

**11.** This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the Arkansas market by designing, manufacturing, distributing, marketing, selling, warranting, and/or servicing the J100 in Arkansas, and Plaintiffs' claims arise out of that conduct.

**12.** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here, including the delivery, attempted operation, repeated failures, and crashes of the Drones on Plaintiffs' farmland in and around Tillar, Arkansas, which lies in the Eastern District of Arkansas.

**13.** This Court has personal jurisdiction over Suzhou EAVISION Robotic Technologies Co., Ltd. because it purposefully directed the J100 into the United States and Arkansas markets by designing and manufacturing the J100 for U.S. agricultural use, partnering on December 9, 2024, with Agri Spray Drones to bring its "flagship" J100 to U.S. farmers, and placing the J100 into the stream of commerce intending that it reach Arkansas purchasers. Plaintiffs' claims arise out of that conduct.

**14.** This Court has personal jurisdiction over Defendant Taylor Moreland because Moreland personally and purposefully directed tortious conduct at the Arkansas market: he

personally made, approved, and directed Agri Spray Drones' uniform marketing representations concerning the J100, including his on-camera representations in the publicly distributed "First Look" video, while knowing and intending that those representations would reach and induce purchasers in Arkansas, including Plaintiffs. Plaintiffs' fraud claims arise directly out of that Arkansas-directed conduct.

## III. PARTIES

**15.** Plaintiff Danny C. Day, Jr., Inc. is an Arkansas corporation with its principal place of business in or around Tillar, Arkansas (Desha County), engaged in commercial farming in Arkansas. Danny C. Day, Jr., Inc. acts through its officers, Danny Day, Jr., its president, and Bradley Day, its vice president, who at all relevant times conducted the purchase, operation, and attempted repair of the Drones on behalf of and for the benefit of Danny C. Day, Jr., Inc. Danny C. Day, Jr., Inc. is a purchaser and owner of the Drones and a real party in interest in this action.

**16.** Plaintiff Danny Day, Jr. is an adult resident and citizen of Arkansas who farms in and around Tillar, Arkansas, individually and doing business as Danny Day, Jr. Farms. Together with Bradley Day, Danny Day, Jr. purchased two J100 Drones individually and on behalf of Danny C. Day, Jr., Inc.

**17.** Plaintiff Bradley Day, Danny Day, Jr.'s son, is an adult resident and citizen of Arkansas who farms in and around Tillar, Arkansas, individually and doing business as Bradley Day Farms. Together with Danny Day, Jr., Bradley Day purchased two J100 Drones individually and on behalf of Danny C. Day, Jr., Inc.

**18.** Plaintiffs Danny C. Day, Jr., Inc., Danny Day, Jr., and Bradley Day are referred to in this Complaint as the "Class Representatives." Allegations in this Complaint describing the

purchase, operation, repair, and return of the Drones describe acts undertaken by Danny Day, Jr. and Bradley Day on behalf of Plaintiffs' coordinated family farming operation.

**19.** Plaintiff Danny Day, Jr. & Son Partnership is, on information and belief, an Arkansas general partnership composed of Danny Day, Jr. and Bradley Day that farms in and around Tillar, Arkansas. On information and belief, the Partnership purchased one or more J100 Drones on or after December 1, 2024.

**20.** Defendant Suzhou EAVISION Robotic Technologies Co., Ltd. ("Suzhou" or the "Manufacturer") is a company organized under the laws of the People's Republic of China, with its principal place of business in Suzhou, China. On information and belief, Suzhou designed, developed, and manufactured the J100, including its lidar and obstacle-avoidance, wiring, battery and thermal, and spraying systems, and placed the J100 into the stream of commerce intending that it be sold to United States and Arkansas customers, including through its U.S. partner Agri Spray Drones and the U.S. importer E.A. Vision, Inc.

**21.** Defendant E.A. Vision, Inc. ("E.A. Vision") is a California corporation with its principal place of business at 7481 La Palma Avenue, Buena Park, California 90620 (California Secretary of State Entity No. 3333591). On information and belief, E.A. Vision is the U.S. importer and distributor that placed the J100 Drones into the stream of commerce in the United States.

**22.** Defendant Agri Spray Drones, LLC ("Agri Spray Drones") is a Missouri limited liability company (Missouri Charter No. LC001674917), formed on or around January 1, 2020, whose registered agent is Taylor Moreland at 6875 Audrain Road 111, Centralia, Missouri 65240. On information and belief, Agri Spray Drones markets, distributes, and sells the J100 and administers the J100 warranty program.

**23.** Defendant C4 Drone Services, LLC ("C4 Drone Services") is an Oklahoma limited liability company (Oklahoma Filing No. 3513508170; status "In Existence") with a business address at 3302 Mariposa, Duncan, Oklahoma 73533. C4 Drone Services was the dealer/seller that invoiced and delivered the Drones to Plaintiffs.

**24.** Defendant Taylor Moreland ("Moreland") is, on information and belief, a citizen of the State of Missouri. Moreland is the founder and Chief Executive Officer of Defendant Agri Spray Drones, LLC, a member of that company, and its registered agent and sole organizer of record. At all relevant times, Moreland personally controlled and directed Agri Spray Drones' marketing of the J100 and personally made, approved, and directed representations concerning the J100's capabilities. Moreland is sued in his individual capacity for his own tortious conduct, and not solely by reason of his membership or office in Agri Spray Drones, LLC. Moreland is named only in the Fifth and Sixth Causes of Action.

**25.** **Relationship among Defendants**. On December 9, 2024, Agri Spray Drones publicly announced a partnership with EAVision to bring EAVision's flagship J100 to the U.S. market. In the announcement, Taylor Moreland, "Founder and CEO of Agri Spray Drones," stated that Agri Spray Drones would be "expanding its offerings with EAVision's flagship drone (the J100), while continuing to service and support existing product offerings," and Dr. Wang Xinyu, "chairman of EAVision," described EAVision as a "manufacturer" "Located in China and Silicon Valley."[1] Defendant C4 Drone Services served as the local dealer that sold and delivered the J100 Drones to Plaintiffs. On information and belief, C4 Drone Services acted through its representative Peter Crouch, who delivered the Drones to Plaintiffs' farm headquarters, walked Plaintiffs through

---

[1] Agri Spray Drones, "Agri Spray Drones Partners with EAVision to Bring J100 Spray Drone to U.S. Farmers," PR Newswire (Dec. 9, 2024). The EA-J100 User Manual, filed at FAA docket FAA-2026-0003-0001 (attach. 6), states that the J100 was "developed and manufactured by" Suzhou EAVISION Robotic Technologies Co., Ltd. (China).

certain controls, supplied replacement parts, and assisted with reassembly and attempted repairs. On information and belief, Agri Spray Drones also prepared and submitted C4 Drone Services' petition to the Federal Aviation Administration for a Part 137 agricultural-aircraft exemption, further reflecting the interrelationship among Defendants in the marketing, distribution, sale, and operation of the J100.

**26.** Defendants Doe 1 through Doe 100 are persons or entities whose true names and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiffs, who therefore sue them by these fictitious names. On information and belief, each Doe Defendant designed, manufactured, imported, distributed, marketed, sold, warranted, serviced, or otherwise participated in placing the J100 into the stream of commerce, or is otherwise responsible for the conduct and injuries alleged. On information and belief, certain Doe Defendants are dealers and/or distributors of the J100. They are entities that, like Defendant C4 Drone Services, LLC, sold or distributed J100 drones to farmers across the United States, including Arkansas farmers, whose identities are presently unknown to Plaintiffs and will be ascertained through discovery of Defendants' sales and distribution records. Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities once ascertained.

## IV. FACTS

### A. THE EAVISION J100 AND DEFENDANTS' UNIFORM MARKETING REPRESENTATIONS

**27.** Agri Spray Drones markets and sells the J100 through its online storefront at shop.agrispraydrones.com. On its product page for the J100[2], Agri Spray Drones represented, among other things, that:

[2]Quotations (a)–(l) below are reproduced from shop.agrispraydrones.com/products/ea-vision-j100 (accessed June 4, 2026), including the source's own "techology" typo in item (f). A June 18, 2025 Wayback Machine capture shows

(a) *"Take Ag Operations to New Heights"*

(b) *"the EAVision J100 is a groundbreaking agricultural drone designed for high-efficiency performance, and the only drone in the market using lidar technology to fly across a variety of terrains."*

(c) *"Equipped with state-of-the-art mist nozzles, the J100 enables fine, even atomization with precise control over droplet size and spray patterns across diverse crop types."*

(d) *"Its powerful propulsion system offers robust thrust capacity and superior maneuverability, allowing rapid field coverage even in challenging conditions."*

(e) *"With intelligent multi-function capabilities—including advanced lifting, spreading, and surveying functions—the J100 simplifies complex tasks, reduces operational time, and maximizes productivity, adapting to virtually any agricultural application with unmatched accuracy and efficiency."*

(f) *"As the only spray drone with lidar techology* [sic], *obstacle avoidance and terrain following outnumbers its competitors."*

(g) *"The third-generation CCMS nozzle provides fine, uniform atomization with adjustable droplet sizes (10 microns to 620 microns) at up to 6.3 gallons per minute."*

(h) *"Standard 45L tank (optional 60L) with a spray width reaching 36 feet."*

(i) *"Can cover 60 acres/hr at 2 GPA."*

(j) *"The CTB shell and blade-style battery withstands high ambient temperatures (up to 104°F) and can charge in under 9 minutes using a 9000W heat-dissipating charger, compatible with generator or mains power."*

(k) *"Batteries are modular, meaning they can be repaired."*

(l) *"Supports sling loading up to 132 pounds with fast installation and one-click point identification for take-off and landing, reducing risks and doubling efficiency."*

**28.** Agri Spray Drones makes additional service-and-support representations on its landing page at agrispraydrones.com, including that:

(m) *"Welcome to Agri Spray Drones, North America's most experienced distributor of agricultural spray drone technology."*

(n) *"Founded on the principles of integrity, education, and service, we go beyond equipment sales to ensure your success in the field."*

---

items (a)–(l) and the December 9, 2024, PR Newswire press release independently reflects the core lidar and atomization claims before the sale.

(o) *"Additionally, our extensive selection of parts and accessories ensures you have everything you need for seamless spray drone operation and maintenance."*

(p) *"Whether you're aiming to enhance crop health, increase yield, or conserve resources, our line-up of products, services, and industry-leading support will help you achieve your goals with unparalleled efficiency and success."*

(q) *"Agri Spray Drones is dedicated to providing end-to-end agricultural drone solutions."*

**29.** Before purchasing, Plaintiffs Danny Day, Jr. and Bradley Day reviewed Defendants' sales and marketing materials describing the J100 and its capabilities, including the representations set forth above, and received sales presentations and assurances from Defendants' representatives, including from Agri Spray Drones and from C4 Drone Services through Peter Crouch, before they agreed to purchase the Drones. They relied on those representations in deciding to purchase the Drones.

**30.** The J100 Drones failed to perform as represented. Despite the representation that the J100 is "the only spray drone with lidar" whose "obstacle avoidance and terrain following outnumbers its competitors," Plaintiffs' Drones failed to avoid obstacles and crashed; despite representations of "fine, even atomization," the nozzles repeatedly failed to spray, and on another occasion would not stop spraying; and despite the representation that the batteries are "modular" and "can be repaired," a Drone caught fire and burned.

**31.** On information and belief, Moreland, as founder, Chief Executive Officer, and the public face of Agri Spray Drones, personally made, approved, and directed the representations concerning the J100 alleged above. In particular, before Plaintiffs' purchase, Moreland appeared on camera in a publicly distributed "First Look" video promoting the J100 and personally represented, in substance, that the J100 senses obstacles such as power lines well ahead of the aircraft and provides full obstacle avoidance; that its battery is modular and repairable; and that its

spray nozzles deliver fine, even atomization on the order of ten microns. These representations concerned the very capabilities that later failed on Plaintiffs' Drones, as alleged herein.

## B. PLAINTIFFS' PURCHASE AND THE DRONES' REPEATED FAILURES

**32.** Plaintiffs Danny Day, Jr. and Bradley Day purchased two EAVision J100 spray Drones from C4 Drone Services on or about January 22, 2025.

**33.** The Drones malfunctioned from the start. Plaintiffs repeatedly returned the Drones for parts and repairs, yet the Drones were never made to function properly or safely.

**34.** The Drones crashed repeatedly, before and after repair. At times the Drones would not fly at all. Drones have crashed and caught fire. Crashing Drones have come close to people, including Plaintiffs' employees. Crashing Drones have struck and damaged equipment and structures and destroyed crops.

**35.** Among the other failures, there are problems with the Drone nozzles and spray system, including chemicals pouring steadily from a nozzle, leaking, uneven spraying, and failure to spray at all. These problems persisted even after repair.

**36.** Other mechanical issues include Drone motor failure, lift failure, arm latch failure and joystick malfunction.

**37.** Software problems also caused the Drones repeatedly to crash.

**38.** The Drone control-link connection and reconnection to the operator's remote failed on numerous occasions. These loss-of-control-link failures created serious safety hazards for Plaintiffs' personnel and others.

**39.** After the Drones repeatedly failed and could not be made to operate safely or reliably despite repeated repair attempts, Plaintiffs ceased attempting to use them. To get their crops sprayed, Plaintiffs were forced to hire outside flying services to perform the aerial

application the Drones could not perform. (Hereafter referred to as "substitute application" "cover application" or "cover".) On information and belief, other Class members were forced to hire outside services for substitute application due to Drones' repeated failures.

**40.** Each of these failures occurred in the ordinary course of receiving, testing, operating, repairing, or handling the Drones on Plaintiffs' farm, in proximity to Plaintiffs' personnel, equipment, and structures. The Drones' failures caused actual physical damage to property other than the Drones themselves, for example, to equipment, structures, and crops. The repeated crashes, the fires, control-link and joystick failures created a substantial risk of serious physical injury to persons and of damage to property other than the Drones themselves.

### C. DEFENDANTS' OWN KNOWLEDGE HUB ADMITS THE J100'S DEFECTS

**41.** Defendants' own published statements confirm the J100's defects. Agri Spray Drones maintains a publicly accessible online knowledge base at knowledgebase.agrispraydrones.com (the "Knowledge Hub"), on which it publishes technical articles, service bulletins, troubleshooting guidance, and maintenance instructions for the J100. On the Knowledge Hub, Agri Spray Drones admits that "[d]uring production, a subpar wiring harness was used," with "faulty" bullet connectors, and that the Drones suffer from "excessive vibration leading to a buildup of heat and wires breaking," for which EAVision provided replacement wiring harnesses and reimbursed dealers for the repair.

**42.** Agri Spray Drones further admits, in its "J100 Lidar/Radar Coverage and Limitations" article, that the J100 has a "[b]lind spot directly above the drone, and to the rear and above," and warns: "DO NOT OPERATE J100 2 METERS OR CLOSER TO OBJECTS OR OBSTACLES." Plaintiffs experienced crashes consistent with that admitted blind spot, directly

contradicting Defendants' representations that the J100's "obstacle avoidance and terrain following outnumbers its competitors" and that it detects "power lines."

**43.** Defendants' "Obstacle Avoidance Logic" article confirms the cause of reported power-line crashes. As to power lines, it admits that "[b]ecause the upward field of view of the drone is limited, it is necessary to avoid the drone climbing the electric poles," and that "[t]here must be no wires within 8m of the plot boundary, otherwise the wires on the left and right sides may not be detected due to the limited radar vision." Defendants never disclosed these admitted limitations, or the special precautions they require, to Plaintiffs before the sale.

**44.** Defendants also admit that the J100's lidar (a "firmware bug or the lidar going out") is the "[m]ost common cause" of the Drone's failure to follow terrain; that, in high-temperature operation, "the power connection at the battery port may melt due to excessive current, posing a power risk"; and that "[f]ailure to inspect and clean terminals can result in heat welding the battery to the drone," with operators told to check for "black marks indicating arcing or overheating". Defendants also issued a redesigned "V2" battery terminal replacing the original.[3]

## V. CLASS ACTION ALLEGATIONS

**45.** Plaintiffs bring this action on their own behalf, and the Class Representatives additionally bring it pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following proposed Class:

> *All persons and entities in the United States who purchased an EAVision J100 agricultural spray drone on or after December 1, 2024 (when the J100 was launched in the United States) and continuing through the date of class certification.*

---

[3] Agri Spray Drones Knowledge Hub, "J100 Not Following Terrain;" "J100 Preventative Maintenance," and "J100 Battery Terminal Inspection," knowledgebase.agrispraydrones.com (accessed June 4–5, 2026).

**46.** Excluded from the Class are Defendants and their officers, directors, affiliates, and employees; the manufacturer and its affiliates; the assigned judge and staff and their immediate families; and persons asserting personal-injury claims.

**47. Classwide injury; no uninjured members.** Every Class member suffered the same injury at the point of sale: each paid for a J100 that, because of the uniform defects in its design and manufacture, was worth less than the price paid and less than its represented value. The defects are not unit-specific. As Defendants' own admissions reflect, the J100 was manufactured with a "subpar wiring harness," and the lidar "[b]lind spot directly above the drone" and "limited" upward field of view are inherent characteristics of the J100's design, affecting the J100 line as a whole, not isolated units. Defendants' fleet-wide remediation, replacement wiring harnesses for "current J100 units in the United States" and the redesigned "V2" battery terminal, confirms that the defects are common to the Drones generally. Every Class member therefore overpaid for, and now holds, a diminished-value, defective J100, regardless of whether a particular unit has yet manifested a failure; there are no uninjured Class members. The problems Plaintiffs experienced are a common problem rooted in defects common to every J100, not a fault peculiar to Plaintiffs.

**48. Timeliness.** Plaintiffs' and the Class's claims are timely under the applicable limitations periods. Claims for strict products liability and negligence are governed by the three-year period of Ark. Code Ann. § 16-116-203, which runs from the date the damage occurs and is subject to the discovery rule. Because the J100 was first sold in the United States beginning in December 2024, every Class member's claims fall well within the applicable periods, however measured.

**49.** On information and belief, American agriculture spans approximately 1.9 million farms covering roughly 880 million acres (2022 Census of Agriculture), including extensive

acreage in rice, cotton, corn, soybeans, and other row crops commonly treated by aerial application. Arkansas, home to the named Plaintiffs, illustrates the point. It is among the nation's leading agricultural states, home to approximately 37,756 farms covering roughly 13.7 million acres, and the nation's leading rice producer (approximately 1.1 million acres of rice), with substantial cotton acreage. Agricultural spray drones are increasingly used across the country for such application. A substantial number of farmers across the United States, including in Arkansas, purchased EAVision J100 drones; the precise number is within Defendants' and government agencies' records (e.g. Defendants' sales records, FAA Part 137 and Section 44807 authorizations, and state aerial-applicator licensing records such as the Arkansas Department of Agriculture) and will be established in discovery.

**50. Numerosity (Rule 23(a)(1)).** The Class is so numerous that joinder of all members is impracticable. Defendants' own Knowledge Hub reflects a substantial J100 population: EAVision provided replacement wiring harnesses for "current J100 units in the United States," administered a dealer reimbursement program for the repair, and stated that "the next 400" units were inbound. This indicates that the J100 was sold in volume.[4] Joinder of all Class members would be impracticable, and on information and belief the Class readily exceeds the 100-member floor set by CAFA, 28 U.S.C. § 1332(d)(5)(B).

**51. Commonality (Rule 23(a)(2)).** There are questions of law and fact common to the Class that will generate common answers apt to drive the resolution of this litigation. Because every Class member purchased the same J100 drone, was exposed to the same Defendant-authored representations, received the same J100 afflicted by the same admitted defects, the problems

[4] Agri Spray Drones Knowledge Hub, "J100 Wiring Harness Update," knowledgebase.agrispraydrones.com (accessed June 4, 2026).

Plaintiffs experienced are common across the board to the Class rather than peculiar to Plaintiffs, and Defendants' conduct raises questions that are common to the Class, including, without limitation:

(a) whether the J100 is defective in its design, manufacture, or warnings, including its lidar and obstacle-avoidance system, its wiring and connectors, and its battery and thermal management;

(b) whether Defendants knew of those defects, and when;

(c) whether Defendants uniformly represented that the J100 had superior, lidar-based obstacle avoidance and terrain following and could detect power lines;

(d) whether those representations were false or misleading;

(e) whether Defendants concealed or failed to disclose the J100's known defects and operating limitations, and whether Defendants had a duty to disclose them;

(f) whether Defendants breached the implied warranties of merchantability and fitness for a particular purpose;

(g) whether Defendants were unjustly enriched;

(h) whether Defendants' conduct warrants punitive damages; and

(i) the proper measure of classwide damages and the methodology for calculating them.

**52. Typicality (Rule 23(a)(3)).** The Class Representatives' claims are typical of the claims of the Class. The Class Representatives and every Class member:

(a) purchased the same drone, the EAVision J100 agricultural spray drone, which was designed and manufactured by the same source and distributed and sold through Defendants;

(b) were exposed to the same uniform, Defendant-authored representations about the J100's capabilities, including its lidar-based obstacle avoidance, terrain following, and spraying performance;

(c) received the same defective J100, afflicted by the same defects Defendants have admitted, including the "subpar wiring harness," the lidar "blind spot directly above the drone" and "limited" upward field of view, and battery-terminal overheating;

(d) were injured by the same course of conduct by Defendants — namely, designing, marketing, and selling the J100 as a capable agricultural spray drone notwithstanding the same admitted defects, making the same uniform representations and omissions about its capabilities, and failing to make the Drones perform despite repeated repair attempts — which caused every Class member the same economic injury: paying for Drones that did not work as represented.

The Class Representatives' claims rest on the same legal theories as those of the Class, and their interests are not antagonistic to the Class.

53. **Adequacy (Rule 23(a)(4)).** The Class Representatives will fairly and adequately represent and protect the interests of the Class. The Class Representatives operate a commercial farming operation, purchased the EAVision J100, and suffered the same type of economic injury, i.e. paying for defective Drones that did not perform as represented, as a direct result of the same defects in the Drones and the same uniform misrepresentations and omissions alleged on behalf of the Class. Their claims arise from the same course of conduct by Defendants, rest on the same legal theories, and seek the same categories of relief as those of absent Class members. They have no interests antagonistic to, or in conflict with, those of the Class, and are unaware of any unique defenses Defendants could assert against them that would not apply with equal force to the Class.

**54.** The Class Representatives understand the responsibilities of a class representative, including the duty to act in the best interests of absent Class members, and are prepared and willing to undertake those responsibilities, including by participating in discovery, sitting for deposition, reviewing the pleadings and key filings, and assisting counsel as needed throughout this litigation.

**55.** Plaintiffs have retained Porter & Malouf, P.A., counsel competent and experienced in complex litigation, products-liability and warranty litigation, and class actions, and counsel will vigorously prosecute this action on behalf of the Class.

**56.** **Predominance (Rule 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual Class members. The central liability inquiries, whether the J100 is defective and whether Defendants uniformly misrepresented and concealed its capabilities and limitations, are common, and their resolution will resolve the core of the case for the entire Class.

**57.** The liability record is uniform across the Class: a single product line, a common set of defects that Defendants have themselves admitted, and a common body of Defendant-authored marketing.

**58.** The Class is defined so that membership turns on the objective fact of having purchased the same defective J100. The Class is prosecuted primarily on theories that do not depend on any individual Class member's reliance: principally breach of the implied warranty of merchantability and a uniform-defect (overpayment / diminished-value) theory under which classwide injury flows from common proof that every member purchased the same defective J100 for more than it was worth. The fraud-based claims are asserted by Plaintiffs individually and on behalf of the Class to the extent permitted by Rule 23, including certification of common issues

under Rule 23(c)(4). So framed, common questions predominate over any questions affecting only individual members.

**59. Superiority (Rule 23(b)(3)).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Many Class members are family farming operations whose claims, though substantial in the aggregate, may be too small individually to justify the cost of separate litigation against a manufacturer and distributors with greater resources. Class treatment promotes judicial economy by resolving in one proceeding common questions that would otherwise be litigated repeatedly on the same drone, the same defects, the same representations, and the same legal theories. Class treatment also avoids the risk of inconsistent adjudications. Liability turns largely on common documentary proof, making the Class manageable.

**60. Ascertainability.** The Class is readily ascertainable by reference to objective records. The identity of J100 purchasers is contained in Defendants' sales, delivery, and warranty records, and can be cross-referenced against FAA Part 137 agricultural-aircraft-operator and Section 44807 exemption records and state aerial-applicator licensing records, such as the Arkansas Department of Agriculture's, from which Class membership can be confirmed objectively.

## VI. TRADE AND COMMERCE

**61.** At all relevant times, Defendants were engaged in trade and commerce by designing, manufacturing, importing, distributing, marketing, advertising, selling, warranting, and/or servicing the J100, including in interstate commerce and in States throughout the United States, including Arkansas. Defendants' representations and conduct described herein occurred in

the course of that trade and commerce and were directed at and reached J100 purchasers nationwide.

## VII. CAUSES OF ACTION

### A. FIRST CAUSE OF ACTION — STRICT PRODUCTS LIABILITY

***(Ark. Code Ann. § 16-116-101 (formerly § 4-86-102); Arkansas Product Liability Act, Ark. Code Ann. § 16-116-201 et seq.) — design defect, failure to warn, and manufacturing defect; against all Defendants in the chain of distribution***

**62.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**63.** At all relevant times each Defendant was a "supplier" engaged in the business of manufacturing, assembling, distributing, and/or selling the J100. Suzhou was the designer, producer, and assembler, i.e., the manufacturer, of the J100 and its component parts. Strict liability does not require any contractual relationship or privity between Plaintiffs or the Class and any Defendant.

**64.** Defendants supplied the J100 in a "defective condition," a condition that rendered it unsafe for its reasonably foreseeable use, and that made it "unreasonably dangerous," that is, dangerous to an extent beyond that which would be contemplated by the ordinary and reasonable buyer or user of an agricultural spray drone. The J100's defects made it prone to catastrophic in-flight failures, such as crashing, colliding with obstacles, and catching fire, while it operated at low altitude over fields, equipment, and people, endangering persons and property to a degree far beyond what an ordinary purchaser would expect. As alleged above, those dangers were realized in the failures of Plaintiffs' Drones. The J100 was unreasonably dangerous in at least the following respects, each of which independently supplies the defective condition required for strict liability:

(a) **Design defect.** The J100's lidar and obstacle-avoidance system was designed with a "[b]lind spot directly above the drone" and a "limited" upward field

of view, causing the Drone to fly into objects above it; and its wiring, connectors, and battery-terminal and thermal systems were designed in a manner prone to vibration-induced wire breakage and to overheating, melting, and fire; and its flight-control and communication systems were designed in a manner prone to loss of the control-link connection between the Drone and the operator's remote. These design characteristics rendered the J100 unreasonably dangerous for ordinary agricultural use. Defendants' own later redesigns, the upgraded wiring harness and the redesigned "V2" battery terminal, demonstrate both the defect and the feasibility of a safer design.

(b) **Failure to warn and inadequate instructions.** The J100 was unreasonably dangerous without adequate warnings of its known limitations. Defendants disclosed the lidar "blind spot," the "do not operate within 2 meters" limitation, the power-line-climbing risk, and the battery-terminal maintenance needed to avoid "heat welding"/fire only after the sale, through their Knowledge Hub, while marketing the J100 as having "superior" obstacle avoidance and the ability to detect "power lines." Had Plaintiffs and the Class been given adequate warnings, they would have read and heeded them.

(c) **Manufacturing defect.** As Defendants admit, "[d]uring production, a subpar wiring harness was used," with "faulty" bullet connectors, so that the J100 was supplied in a condition that departed from its intended condition and was unreasonably dangerous.

**65.** Each of these defective conditions existed when the J100 left Defendants' control, and the Drones reached Plaintiffs without substantial change in their condition. The defective

conditions were a proximate cause of both the Drones' repeated failures (the crashes, collisions, fires, and the spraying, joystick and software failures) each of which endangered Plaintiffs' personnel and property, and of the resulting damages to Plaintiffs and the Class.

### B. SECOND CAUSE OF ACTION — NEGLIGENCE

***(negligent design, manufacture, distribution, testing, and inspection)***

**66.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**67.** Each Defendant in the chain of distribution owed Plaintiffs and the Class a duty of reasonable care in the design, manufacture, assembly, testing, inspection, distribution, sale, marketing, and servicing of the J100. That duty was heightened because the J100 is a heavy, autonomously operated aircraft that carries chemical payloads and operates at low altitude near crops, structures, equipment, and people, where a failure can cause crashes, fires, and collisions that endanger them.

**68.** Defendants breached those duties of care in at least the following respects:

(a) **Negligent design.** Defendants negligently designed the J100's lidar and obstacle-avoidance system with a blind spot directly above the drone and a limited upward field of view, and designed its wiring, connectors, and battery-terminal and thermal systems in a manner prone to vibration-induced wire breakage and to overheating, melting, and fire, and designed its flight-control and communication systems in a manner prone to loss of the control-link connection to the operator's remote.

(b) **Negligent manufacture and assembly.** Defendants negligently manufactured and assembled the J100 using, as they admit, a "subpar wiring harness" and "faulty" bullet connectors.

(c) **Negligent failure to test and inspect.** Defendants placed the J100 on the market without adequate testing and inspection, as their later, hurried remediation, the replacement wiring-harness program and the redesigned "V2" battery terminal, confirms.

**69.** Defendants knew, as their own Knowledge Hub admissions and remediation programs reflect, or, in the exercise of reasonable care, should have known, of these defects and dangers, yet failed to act with reasonable care. Defendants' negligence proximately caused both the Drones' repeated failures, including the crashes, collisions, fires, and the spraying, joystick, and software failures, each of which endangered persons and property, and the resulting damages to Plaintiffs and the Class.

**70. Pre-suit notice; failure of limited remedies; ineffectiveness of disclaimers.** Plaintiffs provided Defendants, including the seller C4 Drone Services, with timely pre-suit notice of the Drones' nonconformities and breach, including by written demand of February 9, 2026, satisfying Ark. Code Ann. § 4-2-607(3)(a). Plaintiffs also gave Defendants notice of the nonconformities throughout the relevant period by repeatedly returning the Drones for parts and repairs. To the extent any Defendant purports to have disclaimed implied warranties or limited Plaintiffs' remedies to repair or replacement of parts, any such exclusive or limited remedy failed of its essential purpose under Ark. Code Ann. § 4-2-719(2): the Drones were returned for repair repeatedly and were never made to operate safely or as warranted, depriving Plaintiffs and the Class of the substantial value of their bargain, so that all remedies provided by the UCC are available. Any purported disclaimer or limitation is also unconscionable and ineffective in light of Defendants' knowing concealment of the J100's defects at the time of sale.

## C. THIRD CAUSE OF ACTION — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

***(Ark. Code Ann. § 4-2-314)***

**71.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**72.** Each Defendant engaged in selling the J100 is a merchant with respect to goods of that kind, and an implied warranty of merchantability therefore arose by operation of law. Plaintiffs and the Class are persons reasonably expected to use the J100: they are commercial farming operations and aerial-application operators who purchased the Drones and used, or attempted to use, them for the ordinary agricultural purpose for which the J100 was marketed and sold to farmers. The Drones were not merchantable: they would not pass without objection in the trade, were not of fair average quality, and were not fit for the ordinary purposes for which agricultural spray drones are used — they repeatedly crashed, would not reliably spray, and caught fire. Defendants thereby breached the implied warranty of merchantability, and that breach was a proximate cause of damages to Plaintiffs and the Class.

## D. FOURTH CAUSE OF ACTION — BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

***(Ark. Code Ann. § 4-2-315) — pleaded in the alternative to merchantability***

**73.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**74.** At the time of sale, Defendants had reason to know the particular purpose for which Plaintiffs and the Class required the Drones, not only the autonomous aerial application of crop inputs over their specific fields and crops, but the time-sensitive treatment of the acreage Plaintiffs planned to spray by drone, and that buyers were relying on Defendants' skill and judgment,

including as reflected in Defendants' marketing and service-and-support representations, to select and furnish Drones suitable for that purpose. An implied warranty of fitness for that particular purpose thereby arose. The Drones were not fit for that purpose. They could not reliably fly or spray and repeatedly failed, preventing Plaintiffs from treating their crops in the critical time period without substitute methods. Thus, Defendants breached the warranty, damaging Plaintiffs and the Class.

### E. FIFTH CAUSE OF ACTION — FRAUDULENT MISREPRESENTATION

***(common law) — pleaded with particularity under Fed. R. Civ. P. 9(b); asserted by Plaintiffs individually and on behalf of the Class to the extent permitted by Rule 23, including certification of common issues under Rule 23(c)(4)***

**75.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**76.** Defendants represented to purchasers, including Plaintiffs Danny Day, Jr. and Bradley Day, that the J100 would perform as promised. On its product page at shop.agrispraydrones.com and in its December 9, 2024 press release, both from before Plaintiffs' January 22, 2025 purchase, Agri Spray Drones (and, as to the press release, EAVision) represented, among other things, that the J100 is "the only spray drone with lidar" whose "obstacle avoidance and terrain following outnumbers its competitors," that it delivers "fine, even atomization," and that its batteries are "modular" and "can be repaired," together with the specific coverage, spray-width, and battery specifications set forth in Section IV.A. These were representations of material fact.

**77.** **Particularity as to each Defendant (Rule 9(b)).** Specifically: (a) Agri Spray Drones made the representations quoted in ¶¶ 27–28 on its product page at shop.agrispraydrones.com and its landing page at agrispraydrones.com, continuously from before Plaintiffs' January 22, 2025 purchase; (b) Agri Spray Drones and Suzhou (through its chairman,

Dr. Wang Xinyu) jointly made the representations in the December 9, 2024 PR Newswire press release announcing the J100 partnership; (c) Moreland personally made the on-camera representations in the publicly distributed "First Look" video described in ¶ 31, before Plaintiffs' purchase; and (d) C4 Drone Services, through its representative Peter Crouch, repeated and endorsed Defendants' representations concerning the J100's obstacle avoidance, spraying performance, and reliability in sales communications with Plaintiffs.

**78.** The representations were false, and Defendants knew they were false or made them with reckless disregard for their truth. Defendants' own Knowledge Hub admits that the J100's lidar has a "[b]lind spot directly above the drone" and a "limited" upward field of view and must not be operated within two meters of obstacles, and the manufacturer's own warranty excludes obstacle-avoidance failures involving wires and power lines, contradicting the represented "superior" obstacle avoidance and power-line detection; the nozzles repeatedly failed to atomize and spray; and the batteries could not be repaired and one caught fire.

**79.** Defendants made these representations intending to induce purchasers, including Plaintiffs and the Class, to buy the J100. In deciding to purchase the Drones, Plaintiffs justifiably and reasonably relied on Defendants' representations and descriptions of the J100's capabilities, including its represented lidar-based obstacle avoidance and ability to detect power lines, its terrain following, its "fine, even atomization" and spraying performance, and its "modular" batteries that "can be repaired". Plaintiffs would not have purchased the Drones, or would not have paid the price they paid, had they known those representations were false. Plaintiffs were damaged as a direct and proximate result of their reliance on those representations.

**80.** Defendant Moreland personally made, approved, and directed the misrepresentations alleged in this Cause of Action, and is individually liable for them regardless of his membership or office in Agri Spray Drones, LLC.

## F. SIXTH CAUSE OF ACTION — FRAUDULENT CONCEALMENT

***(common law — fraudulent concealment / fraud by silence); the uniform omissions support classwide treatment of materiality, with reliance reserved for Rule 23(c)(4) or individual proof***

**81.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**82.** Defendants knew of, but concealed and failed to disclose, material facts about the J100, including its known defects and operating limitations: the lidar "[b]lind spot directly above the drone" and "limited" upward field of view, the instruction not to operate within two meters of obstacles, the power-line-climbing risk, the "subpar wiring harness" and "faulty" connectors, and the battery-terminal overheating that can "result in heat welding the battery to the drone." A reasonable purchaser would consider these facts important. Defendants disclosed these limitations, if at all, only after the sale, through their Knowledge Hub.

**83.** Defendants had a duty to disclose these facts. Defendants had superior and, in many respects, exclusive knowledge of the J100's hidden defects and limitations that was not reasonably accessible to Plaintiffs or the Class; and, having undertaken to represent that the J100 had "superior" obstacle avoidance and could detect "power lines," Defendants had a duty not to mislead by telling only part of the truth.

**84.** Defendants concealed these facts with the intent that Plaintiffs and the Class rely by purchasing and using the J100. Plaintiffs were unaware of the concealed defects and limitations and, in the exercise of reasonable diligence, could not have discovered them before purchasing. The defects were latent and not apparent from inspection of the Drones. For example, the Drones

malfunctioned repeatedly by crashing, failing to spray, and catching fire. This would not be apparent without operational use, and occurred only after Plaintiffs had already purchased the Drones and begun to use them. Had the concealed facts been disclosed, Plaintiffs would have acted differently and would not have purchased the Drones, and Plaintiffs were damaged as a result.

**85.** Defendant Moreland, possessing superior and exclusive knowledge of the J100's defects, personally participated in and directed the concealment and non-disclosure alleged in this Cause of Action, and is individually liable for it.

### G. SEVENTH CAUSE OF ACTION — UNJUST ENRICHMENT

***(in the alternative to the warranty claims)***

**86.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**87.** Plaintiffs and the Class conferred a benefit on Defendants by paying for the J100 Drones and related parts, repairs, service, and support. This benefit then flowed up the distribution chain to the distributor, Agri Spray Drones, the U.S. importer, E.A. Vision, and the manufacturer, Suzhou. Defendants appreciated and retained those benefits.

**88.** It would be inequitable for Defendants to retain those benefits without restitution, because the J100 Drones were defective and did not perform as represented and Plaintiffs and the Class received little or no value in return. Plaintiffs and the Class are therefore entitled to restitution and disgorgement of the amounts by which Defendants were unjustly enriched.

## VIII. PUNITIVE DAMAGES

**89.** Plaintiffs re-allege and incorporate by reference each and every preceding paragraph as though fully set forth herein.

**90.** Plaintiffs and the Class are entitled to an award of punitive damages. Under Arkansas law, punitive damages are recoverable on clear and convincing evidence that the defendant either (a) knew or ought to have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in injury or damage and continued that conduct with malice or in reckless disregard of the consequences, or (b) intentionally pursued a course of conduct for the purpose of causing injury or damage.

**91.** Defendants knew of the J100's defects and limitations and sold and continued to sell the Drones anyway, without disclosing them. As Defendants' own materials reflect, Defendants knew that the J100 was built with a "subpar wiring harness" and "faulty" connectors that produced "excessive vibration leading to a buildup of heat and wires breaking"; that the battery-port connection "may melt" and that terminal failures could "result in heat welding the battery to the drone"; and that the lidar obstacle-avoidance system had a "[b]lind spot directly above the drone" and a "limited" upward field of view requiring operators to "avoid the drone climbing the electric poles." Despite this knowledge, Defendants marketed the J100 as the "only spray drone with lidar," whose "obstacle avoidance and terrain following outnumbers its competitors," and sold it to Plaintiffs and the Class without disclosing the known defects and limitations.

**92.** Defendants' post-sale conduct confirms both their knowledge and their conscious decision to manage the defects quietly rather than warn purchasers. On information and belief, EAVision distributed replacement wiring harnesses together with a per-drone reimbursement (a de facto recall) and redesigned the battery terminal (from the original to a "V2" design) to address the overheating, yet did not provide Plaintiffs a clear, direct warning of the defects, and disclosed the obstacle-avoidance "blind spot," the "do not operate within 2 meters" limitation, and the

power-line-climbing risk only through after-the-fact Knowledge Hub articles that, on information and belief, were published after the sale to Plaintiffs.

**93.** Defendants' conduct was aggravated by the nature of the product and the persons affected. The J100 is a heavy, autonomously operated aerial vehicle carrying chemical payloads over fields, equipment, structures, and people; its defects created risks of crashes, fire, and collisions with obstacles, as occurred here. Defendants directed their uniform misrepresentations and omissions at a class of commercial farmers who depend on functioning aerial-application equipment during time-sensitive growing seasons, and who could not discover the concealed defects through ordinary diligence. Defendants placed their own financial interest in launching and selling their "flagship" drone ahead of the safety and economic interests of their customers.

**94.** Defendants' conduct was therefore willful, wanton, malicious, and in reckless disregard of the rights and safety of Plaintiffs and the Class, justifying an award of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from similar conduct.

**95.** Arkansas imposes no statutory cap on the amount of punitive damages that may be awarded. The statutory cap formerly codified at Ark. Code Ann. § 16-55-208 was held unconstitutional under Article 5, § 32 of the Arkansas Constitution, which prohibits laws limiting the amount recoverable for injuries. Any punitive award remains subject to federal constitutional due-process review of its reasonableness.

## IX. JURY TRIAL DEMANDED

**96.** Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

**97.** WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

(1) Certify this action as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiffs Danny C. Day, Jr., Inc., Danny Day, Jr., and Bradley Day as Class Representatives, and appoint the undersigned as Class Counsel;

(2) Award Plaintiffs and the Class compensatory and other damages in amounts to be proven at trial;

(3) Award restitution and disgorgement of any amounts by which Defendants were unjustly enriched, to the extent not duplicative of the damages awarded above;

(4) Award punitive damages in an amount sufficient to punish and deter, there being no statutory cap on punitive damages under Arkansas law;

(5) Award pre- and post-judgment interest and attorneys' fees and costs as permitted by law; and

(6) Grant such other and further relief as the Court deems just and proper.

Dated: June 18, 2026.

Respectfully submitted,

Timothy W. Porter, Ark. Bar No.: 2012184
***Counsel for Plaintiffs and the Proposed Class***
PORTER & MALOUF, P.A.
825 Ridgewood Road, Ridgeland, MS 39157
P.O. Box 12768, Jackson, MS 39236
Telephone: (601) 957-1173
Facsimile: (601) 957-7366
e-mail: tim@portermalouf.com